IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 19-cv-02541-PAB-SKC

TITAN FEEDING, LLC,

     Plaintiff,

v.

COREY CATTLE COMPANY, LLC,
JON COREY, and
DANTES HOLDINGS, LLC,

     Defendants.

_____

**ORDER**
_____

This matter is before the Court on Dantes Holdings, LLC's Motion to Dismiss

Amended Complaint [Docket No. 121] and Jon Corey's Motion to Dismiss Amended

Complaint [Docket No. 122].  Plaintiff responded to both motions, Docket Nos. 124, 127,

respectively, and defendants Dantes Holdings, LLC ("Dantes") and Jon Corey

(collectively, "defendants") replied.  Docket Nos. 135, 136, respectively.  Both

defendants seek to dismiss plaintiff's complaint for lack of personal jurisdiction under

Federal Rule of Civil Procedure 12(b)(2) or, alternatively, for failure to state a claim

under Federal Rule of Civil Procedure 12(b)(6).

# I. BACKGROUND[1]

Plaintiff is a limited liability company that has its United States headquarters in

_____

[1] The following facts are taken from plaintiff's Amended Complaint and Jury
Demand [Docket No. 55] and are assumed to be true for resolving defendants' motions.
*See Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).

Fort Collins, Colorado.  Docket No. 55 at 2, ¶ 5.  Defendant Corey Cattle Company, LLC ("Corey Cattle") is a limited liability company based in Utah with two members, former defendant Michael Corey[2] and defendant Jon Corey (collectively, with Corey Cattle, the "Corey Defendants").  *Id.*, ¶ 6.  Jon Corey, a resident of either Utah or Virginia, is Corey Cattle's majority owner and manages Corey Cattle with his brother, Michael Corey, who lives in Utah and is Corey Cattle's minority member and a manager.  *Id.*, ¶¶ 7–8.  Jon Corey owns 100% of Dantes, which owns the property that Corey Cattle uses.  *Id.* at 3, ¶ 9.  Plaintiff alleges that, because Jon Corey owns and controls Dantes, "any knowledge held by Jon Corey is also held by Dantes," and Dantes is liable for Jon Corey's actions.  *Id.* at 9, ¶¶ 33–34.  Dantes directed its conduct at Colorado by allegedly "taking money from a Colorado resident knowing that" plaintiff would suffer damages in Colorado.  *Id.*, ¶ 35.

In early 2017, the Corey Defendants contacted one of plaintiff's representatives in Fort Collins to solicit an investment and feeding agreement through "Notch Peak Cattle Company," which plaintiff states is a Colorado limited liability company.  *Id.* at 4, ¶¶ 16–17.[3]  The Corey Defendants drafted the solicitations and communicated with plaintiff in Colorado, sending a draft "Cattle Purchase Contract" to plaintiff in Colorado, *id.*, ¶¶ 16, 18, and directed their communications to plaintiff's Colorado office.  *Id.* at 5, ¶ 20.  Jon Corey reviewed, approved, and/or authored the solicitations and

---

[2] Plaintiff no longer asserts claims against Michael Corey, who received a bankruptcy discharge in 2021.  *See* Docket Nos. 114, 127 at 2 n.2.

[3] In reply, defendants contend that Notch Peak is a "Utah LLC," *see* Docket No. 135 at 6; Docket No. 136 at 4; however, as discussed below, the Court resolves factual disputes in plaintiff's favor.  D*udnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008).

communications, which plaintiff alleges were the "genesis" of defendants' scheme and that defendants knew that the solicitations and communications would be sent to Colorado. *Id.*, ¶ 21. Moreover, plaintiff held title to the cattle at issue in the Contracts, and the Corey Defendants sourced the cattle from Colorado. *Id.* at 5–7, ¶¶ 22, 26.[4] The Contracts state that Colorado law applies to them and that disputes are to be litigated in Colorado. *Id.* at 5, ¶ 22. The Corey Defendants processed plaintiff's cattle using Colorado brands, brand certificates and registration, and Colorado freight and shipping records. *Id.* at 6, ¶ 25. Corey Cattle, at the direction of Jon and Michael Corey, filed suit in Colorado to enforce one or more of these Contracts. *Id.* at 8, ¶ 27. Plaintiff further alleges that the Corey Defendants funded their enterprise with loans, which list Jon Corey personally as a borrower, through a Colorado based contact at Rabo Agrifinance. *Id.*, ¶ 28. The Corey Defendants also sent feed bills and invoices to plaintiff in Colorado. *Id.*, ¶ 29. Finally, plaintiff incurred losses in Colorado based on the conduct described in the complaint. *Id.* at 9, ¶ 32.

Under the Contracts, starting in 2017, Corey Cattle, through Michael Corey, sold cattle to plaintiff, after which plaintiff owned the cattle. *Id.* at 10, ¶ 41. The Corey Defendants, however, continued to feed and care for plaintiff's cattle, which plaintiff paid for. *Id.* The Contracts provided that the Corey Defendants "agreed to keep and maintain accurate records" of the cattle in their custody. *Id.* When the cattle reached a designated weight, Corey Cattle agreed to repurchase the cattle. *Id.*

---

[4] Plaintiff entered into a contract on July 19, 2017 ("Contract 2"), wherein plaintiff purchased 564 head of cattle; August 23, 2017 ("Contract 3"), wherein plaintiff purchased 479 head of cattle; December 7, 2017 ("Contract 5"), wherein plaintiff purchased 490 head of cattle; and December 22, 2017 ("Contract 6"), wherein plaintiff purchased 755 head of cattle. *Id.* at 11–12, ¶¶ 46–49. Collectively, the Court refers to the contracts as the "Contracts."

In summer 2019, plaintiff discovered the several hundred of its cattle were missing from the Corey Defendants' feedlot. *Id.* at 9, ¶ 38.  The Corey Defendants acknowledged that the cattle were gone and "confessed to having severe financial problems." *Id.*, ¶ 39.  Apparently, Michael Corey initially claimed that defendants sold the cattle because Corey Cattle was in financial difficulty. *Id.* at 16, ¶ 74.  Plaintiff alleges that the Corey Defendants stole and sold plaintiff's cattle, while the cattle were in the Corey Defendants' custody, and pocketed the money. *Id.* at 10, ¶ 43.[5]  Plaintiff claims that, through feed bills, reports, and verbal representations, the Corey Defendants falsely represented to plaintiff that the cattle were still in the Corey Defendants' custody even after they were sold. *Id.*, ¶¶ 43–44.  For instance, the Corey Defendants stated that they had fed the Sold Cattle $112,545.12 in feed during April 2019, yet the cattle were already gone from defendants' feedlots by then. *Id.* at 12, ¶ 53.  On June 29, 2019, after plaintiff discovered that the Corey Defendants had sold plaintiff's cattle and kept the proceeds, plaintiff recovered approximately 958 head of its remaining cattle. *Id.* at 16, ¶¶ 80–81.

Plaintiff alleges that Jon Corey, as Corey Cattle's majority owner and manager, was directly involved in this theft from plaintiff, as he "received and authored communications concerning the relationship, oversaw financial and legal matters concerning the relationship, and ultimately pocketed money" that was owed to plaintiff

---

[5] In particular, plaintiff alleges that defendants "stole" 20 head of cattle worth $49,241.14 in violation of Contract 2; 369 head of cattle worth $844,663.62 in violation of Contract 3; 302 head of cattle worth $670,249.63 in violation of Contract 5; and 167 head of cattle worth $347,081.23 in violation of Contract 6. *Id.* at 11–12, ¶¶ 46–49. Collectively, this amounts to 858 head of cattle worth $1,911,235.62. *Id.* at 12, ¶ 51. The Court refers to the 858 cattle as the "Sold Cattle."  Michael Corey and Corey Cattle claim that the sale of the cattle and the inaccurate feed bills were the result of a "branding error," which plaintiff disputes. *Id.* at 16, ¶¶ 77–79.

for the sale of the Sold Cattle. *Id.* at 13, ¶ 55.  While plaintiff and Corey Cattle were involved in business dealings, Jon Corey's equity ownership in Corey Cattle increased, yet his capital withdrawals decreased, which plaintiff alleges motivated Jon Corey to "take sums from Corey Cattle in other ways." *Id.*, ¶ 56.  For instance, in May 2019, a representative of plaintiff, Hugh Skocdopole, inquired of the proceeds of the Sold Cattle via email to Michael Corey. *Id.* at 13–14, ¶ 59.  Michael Corey responded that Jon Corey "took" the money and that Jon Corey "was going to 'get some money back in'" so that plaintiff could be paid. *Id.*  Jon Corey, however, never did. *Id.* at 14, ¶ 60.  Instead, Jon Corey "diverted" the funds to Dantes by accessing Corey Cattle's bank account, into which Corey Cattle had deposited the proceeds from the cattle it sold, and transferring $478,979.21 to Dantes. *Id.*, ¶¶ 61–62.  Plaintiff states that defendants claim that the payment to Dantes was for money that Corey Cattle owed to Dantes, which plaintiff disputes because Jon and Michael Corey "move money gymnastically" between themselves, Corey Cattle, and Dantes for purposes other than business operations. *Id.*, ¶ 65.

Plaintiff alleges that Corey Cattle is not operated as a distinct corporate entity, but instead operates for the purpose of concealing unlawful acts and diverting funds to insiders. *Id.* at 17, ¶ 84.  For example, Corey Cattle is used to further Michael and Jon Corey's personal interests; Corey Cattle and Jon Corey have the same lender and engage in inside transactions; Jon Corey lists himself as the borrower on Corey Cattle's loan documents; Jon and Michael Corey receive payments from Corey Cattle even though Corey Cattle is not able to meet its financial obligations, including those to plaintiff. *Id.*  Moreover, Corey Cattle's funds are comingled with those of the other

defendants, and Jon Corey has reported Corey Cattle's assets as his own in certificates provided to a lender to obtain credit. *Id.* at 17–18, ¶ 85.

Corey Cattle does not maintain adequate corporate records. *Id.* at 18–19, ¶ 86. Its records relating to its care and feeding of plaintiff's cattle are missing information that industry standards require, including relating to proper head counts and feeding, and Corey Cattle claims to be unable to account for how its apparent branding error could have occurred. *Id.* The Corey Defendants claim to have inadequate financial and accounting records on who bought the Sold Cattle and how the proceeds from the sale of the Sold Cattle have been used. *Id.*

The nature of Corey Cattle's ownership and control facilitate misuse. *Id.* at 19–20, ¶ 87. For instance, Jon Corey owns Dantes, which is Corey Cattle's landlord, and Jon Corey has ensured that Corey Cattle's assets pay Dantes with money owed to plaintiff. *Id.* Jon Corey has unrestricted access to and control over Corey Cattle's finances, even without day-to-day involvement in Corey Cattle's operations. *Id.* Corey Cattle is also thinly capitalized; it lacks sufficient funds to meet its basic obligations, to repay funds owed to plaintiff and other customers. *Id.* at 20, ¶ 88. Plaintiff further alleges that Corey Cattle has been used as a shell for the Corey Defendants to pass funds through to Jon Corey and Dantes, *id.*, ¶ 89, and that Corey Cattle does not properly delineate "borrower status and use of loan proceeds" and lacks internal controls concerning member distributions, expense payments, and withdrawals. *Id.*, ¶ 90.

Plaintiff seeks to hold Jon Corey personally liable because he "perpetrated and benefited" from the conduct, and Dantes is liable for Jon Corey's actions in taking the

proceeds of the Sold Cattle, as Jon Corey owns 100% of Dantes and completely controls it.  *Id.* at 21, ¶¶ 92–94.  According to plaintiff, Jon Corey uses Dantes to hide assets and conduct business outside of Corey Cattle's liabilities.  *Id.*, ¶ 95.  Dantes is not operated as a distinct corporate entity, but rather to collect money from Corey Cattle and to conceal, transfer, and monetize property that Corey Cattle uses, as Jon Corey can access Corey Cattle's assets at will and move them to Dantes without any controls or restrictions.  *Id.*, ¶¶ 96–98.  According to Michael Corey, when Jon Corey took the proceeds of the sale of the Sold Cattle to Dantes, he did so without Michael Corey's knowledge.  *Id.*, ¶ 98.  Dantes also does not maintain appropriate corporate records, is thinly capitalized, and disregards legal formalities.  *Id.* at 21–22, ¶¶ 99–101.  For example, Dantes has permitted the alleged conduct on its property and has taken proceeds of livestock maintained by Corey Cattle, even though Dantes's written agreement with Corey Cattle states that those proceeds are Corey Cattle's property.  *Id.* at 22, ¶ 102.

Plaintiff brings eleven claims for relief: (1) civil theft under Colo. Rev. Stat. § 18-4-405 against all defendants; (2) conversion against all defendants; (3) fraud against the Corey Defendants; (4) breach of Contract 2 against the Corey Defendants; (5) breach of Contract 3 against the Corey Defendants; (6) breach of Contract 5 against the Corey Defendants; (7) breach of contract 6 against the Corey Defendants; (8) fraudulent transfer in violation of Colorado's Uniform Fraudulent Transfers Act ("CUFTA"), Colo. Rev. Stat. § 38-8-101, *et seq.*, against all defendants; (9) civil conspiracy against all defendants; (10) unjust enrichment against Dantes and Corey Cattle; (11) exemplary damages against all defendants.  *Id.* at 22–32, ¶¶ 104–89.

## II.  LEGAL STANDARD

### A.  Lack of Personal Jurisdiction—Rule 12(b)(2)[6]

The purpose of a motion to dismiss under Rule 12(b)(2) is to determine whether the Court has personal jurisdiction over a defendant.  The plaintiff bears the burden of establishing personal jurisdiction.  *Rambo v. Am. S. Ins. Co.*, 839 F.2d 1415, 1417 (10th Cir. 1988).  The plaintiff can satisfy its burden by making a prima facie showing. *Dudnikov*, 514 F.3d at 1070.  The Court will accept the well-pled allegations of the complaint as true in determining whether plaintiff has made a prima facie showing that personal jurisdiction exists.  *AST Sports Sci., Inc. v. CLF Distribution Ltd.*, 514 F.3d 1054, 1057 (10th Cir. 2008).  If the presence or absence of personal jurisdiction can be established by reference to the complaint, the Court need not look further.  *Id.*  The plaintiff, however, may also make this prima facie showing by putting forth evidence that, if proven to be true, would support jurisdiction over the defendant.  *Dudnikov*, 514 F.3d at 1070.  "[A]ny factual disputes in the parties' affidavits must be resolved in plaintiffs' favor."  *Id.*

---

[6] The Tenth Circuit has noted that the extent of a plaintiff's burden to establish personal jurisdiction and the scope of a court's review "depend in part on the nature of the district court's response to defendants' motion seeking dismissal for lack of personal jurisdiction."  *Dudnikov*, 514 F.3d at 1069.  "A district court has discretion to resolve such a motion in a variety of ways – including by reference to the complaint and affidavits, a pre-trial evidentiary hearing, or sometimes at trial itself."  *Id.*  Here, neither party requests an evidentiary hearing; however, both parties have submitted evidence in support of their positions.  The Court therefore will exercise its discretion to resolve the motions based on the documents that the parties submitted.  This decision dictates the standard of review applied.  *See Dudnikov*, 514 F.3d at 1070.  When, as here, personal jurisdiction is reviewed on the basis of the complaint and affidavits, the Court "tak[es] as true all well-pled (that is, plausible, non-conclusory, and non-speculative) facts alleged in plaintiffs' complaint."  *Id.* (citing *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–62 (2007)).  "Similarly, any factual disputes in the parties' affidavits must be resolved in plaintiffs' favor."  *Id.* (citing *FDIC v. Oaklawn Apartments*, 959 F.2d 170, 174 (10th Cir. 1992)).

### B.  Failure to State a Claim—Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible."  *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)).  Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'"  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting Twombly, 550 U.S. at 555) (alterations omitted).  However, a plaintiff still must provide "supporting factual averments" with its allegations.  *Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir. 2009) ("[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." (citation omitted)).  Otherwise, the Court need not accept conclusory allegations.  *Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide

swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson*, 534 F.3d at 1286 (alterations omitted).

## III.  ANALYSIS

"In determining whether a federal court has personal jurisdiction over a defendant, the court must determine (1) whether the applicable statute potentially confers jurisdiction by authorizing service of process on the defendant and (2) whether the exercise of jurisdiction comports with due process."  *Niemi v. Lasshofer*, 770 F.3d 1331, 1348 (10th Cir. 2014); *Trujillo v. Williams*, 465 F.3d 1210, 1217 (10th Cir. 2006) (quoting *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1209 (10th Cir. 2000)).  The Colorado long-arm statute, Colo. Rev. Stat. § 13-1-124, has been construed to extend jurisdiction to the full extent permitted by the Constitution, so the jurisdictional analysis here reduces to a single inquiry of whether jurisdiction offends due process.  *See Hood v. Am. Auto Care, LLC*, 21 F.4th 1216, 1220 (10th Cir. 2021); *Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1276 (10th Cir. 2005); *Archangel Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1193 (Colo. 2005).  Personal jurisdiction comports with due process where a defendant has minimum contacts with the forum state and where those contacts are such that assuming jurisdiction does not offend "traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  Minimum contacts may be established under the doctrines of

general jurisdiction or specific jurisdiction.  Where general jurisdiction is asserted over a nonresident defendant who has not consented to suit in the forum, minimum contacts exist if the plaintiff demonstrates that the defendant maintains "continuous and systematic general business contacts" in the state.  *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998).  Plaintiff does not argue that either Jon Corey or Dantes is subject to the Court's general personal jurisdiction.  The Court, therefore, addresses only specific personal jurisdiction.

Specific jurisdiction is present only if the lawsuit "aris[es] out of or relat[es] to the defendant's contacts with the forum."  *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal.*, 137 S. Ct. 1773, 1780 (2017).  That is, "[a] plaintiff's injury must 'arise out of or relate to' the defendant's forum contacts."  *Compañía de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269, 1284 (10th Cir. 2020) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985)); *see also Hood*, 21 F.4th at 1221–22.  In other words, "there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'"  *Bristol-Myers*, 137 S. Ct. at 1780 (quoting *Goodyear Dunlop Tires Operations, S. A. v. Brown*, 564 U.S. 915, 919 (2011)).  The "common formulation of the rule demands that the suit 'arise out of or relate to the defendant's contacts with the forum.'"  *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026  (2021) (quoting *Bristol-Myers*, 137 S. Ct. at 1780).  This rule does not require "proof of causation" between "a plaintiff's suit and a defendant's activities."  *Id.*  "Specific jurisdiction  . . . is premised on something of a *quid pro quo*: in exchange for 'benefitting' from some purposive conduct directed at the forum state, a

party is deemed to consent to the exercise of jurisdiction for claims related to those contacts." *Dudnikov*, 514 F.3d at 1078.

The specific jurisdiction analysis is two-fold.  First, the Court must determine whether a defendant has such minimum contacts with Colorado that the defendant "should reasonably anticipate being haled into court" here.  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  Within this inquiry, the Court must determine whether the defendant purposefully directed its activities at residents of the forum, *Burger King*, 471 U.S. at 472, and whether plaintiff's claim arises out of or results from "actions by . . . defendant . . . that create a substantial connection with the forum State." *Asahi Metal Indus. Co. v. Sup. Ct. of Cal.*, 480 U.S. 102, 109 (1987) (internal quotations omitted).  "The contacts needed for this kind of jurisdiction often go by the name 'purposeful availment.'" *Ford Motor Co.*, 141 S. Ct. at 1024 (quoting *Burger King*, 471 U.S. at 475); *see also Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (defendant must take "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State").  "The contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.'" *Ford Motor Co.*, 141 S. Ct. at 1025 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)).  "They must show that the defendant deliberately 'reached out beyond' its home – by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there." *Id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (internal quotation marks and alterations omitted)).

Second, if a defendant's actions create sufficient minimum contacts, the Court must consider whether the exercise of personal jurisdiction over the defendant offends

"traditional notions of fair play and substantial justice."  *Asahi*, 480 U.S. at 105.  The

Court considers several factors as part of this analysis, including: (1) the burden on the

defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's

interest in obtaining convenient and effective relief; (4) the interstate judicial system's

interest in obtaining the most efficient resolution of controversies; and (5) the shared

interest of the states in furthering fundamental substantive social policies.  *Burger King*,

471 U.S. at 477; *see also Hood*, 21 F.4th at 1224 ("[T]he forum State can exercise

personal jurisdiction over an out-of-state defendant that has injured a resident plaintiff in

the forum State if (1) the defendant has purposefully directed activity to market a

product or service at residents of the forum State and (2) the plaintiff's claim arises from

essentially the same type of activity, even if the activity that gave rise to the claim was

not directed at forum residents." (citing *Ford*, 141 S. Ct. at 1028–29 & n.5)).

### A.  Jon Corey's Motion to Dismiss

Jon Corey moves to dismiss plaintiff's complaint against him for lack of personal

jurisdiction, arguing that plaintiff has not alleged that he "conducted business in

Colorado" or was a signatory to any of the Contracts.  Docket No. 122 at 1.  If the Court

does have jurisdiction over him, he argues it should dismiss plaintiff's breach-of-

contract, fraud, and fraudulent transfer claims for failure to state a claim.  *Id.* at 2.

### 1.  Personal Jurisdiction over Jon Corey

It is plaintiff's burden to establish the Court's personal jurisdiction over Jon

Corey, *see Rambo*, 839 F.2d at 1417, which burden plaintiff can satisfy by making a

prima facie showing from the complaint.  *Dudnikov*, 514 F.3d at 1070; *AST Sports Sci.*,

514 F.3d at 1057.  Jon Corey insists that, although he owns 80% of Corey Cattle, his

role in the company's daily operations were minimal during the events at issue in this case. Docket No. 122 at 2. He states that he does not live in Colorado, has no experience in the cattle industry, and only visited Corey Cattle's facilities three or four times per year. *Id.* at 2–3. He asserts that he had no involvement in Corey Cattle's business relationship with plaintiff or first-hand knowledge of what occurred "in the summer of 2019 when [plaintiff] visited [Corey Cattle's] feedlot and retrieved some of its cattle," and did not communicate with plaintiff until then. *Id.* at 3. The Court, however, assumes the truth of plaintiff's allegations and resolves factual disputes and makes inferences in plaintiff's favor. *See AST Sports Sci.*, 514 F.3d at 1057; *Dudnikov*, 514 F.3d at 1070.

First, Jon Corey argues that plaintiff fails to show how he "directed his actions at Colorado." Docket No. 122 at 6. Plaintiff's complaint, however, indicates that the issues in this case began with the Corey Defendants' solicitation of plaintiff through Notch Peak Cattle Company ("Notch Peak"),[7] a Colorado limited liability company. Docket No. 55 at 4–5, ¶¶ 16–20.[8] Jon Corey reviewed, approved, and/or authored

---

[7] In reply, Jon Corey argues that "all of the evidence" demonstrates that Notch Peak is a Utah-based LLC. Docket No. 136 at 4. Jon Corey, however, did not raise this issue in his motion, despite plaintiff's allegations concerning Notch Peak, and thereby waived this issue. *See Gutierrez v. Cobos*, 841 F.3d 895, 902 (10th Cir. 2016) ("[A] party waives issues and arguments raised for the first time in a reply brief." (quoting *Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011)). Moreover, plaintiff's response indicates that Notch Peak has filed a registration statement with the Colorado Secretary of State, *see* Docket No. 127 at 2–3, ¶ 4, and the Court resolves factual disputes in plaintiff's favor.

[8] At the pleading stage, the Court credits plaintiff's allegations regarding the Corey Defendants to Jon Corey because plaintiff defined the term "Corey Defendants" as shorthand to refer to Jon Corey, Michael Corey, and Corey Cattle Company. Moreover, although, as Jon Corey notes, the "unilateral activity of another party or a third person cannot provide the necessary contact with the forum state," *see Home-*

14

these solicitations and communications.  *Id.* at 5, ¶ 21.  Later, the Corey Defendants,

including Jon Corey, sent feed bills and invoices to plaintiff in Colorado.  *Id.* at 8, ¶ 29.

The Corey Defendants sold cattle that belonged to plaintiff, a Colorado-based company.

*Id.* at 9–10, 16 ¶¶ 39, 43, 74.  Plaintiff further alleges that Jon Corey, as Corey Cattle's

majority member and manager, was directly involved in the sale of plaintiff's cattle and

that Jon Corey "received and authored communications concerning the relationship,

oversaw financial and legal matters concerning the relationship, and ultimately pocketed

money" that was owed to plaintiff for the sale of the Sold Cattle.  *Id.* at 13, ¶ 55.  These

allegations, assumed to be true, are sufficient to establish that Jon Corey purposefully

directed his activities at plaintiff in Colorado.  *See Burger King*, 471 U.S. at 472; *Ford*

*Motor Co.*, 141 S. Ct. at 1024.  Jon Corey took multiple acts by which he purposefully

availed himself of the privilege of doing business in Colorado, *see Hanson*, 357 U.S. at

253, and his actions were not "random, isolated, or fortuitous" and were volitional.  *See*

*Ford Motor Co.*, 141 S. Ct. at 1025 (quotation omitted).  Jon Corey deliberately reached

out beyond his home and exploited a market in Colorado.  *See id.*  Thus, the Court does

not agree that plaintiff failed to show how Jon Corey directed his actions at Colorado.

Second, Jon Corey argues that the Court cannot exercise personal jurisdiction

over him simply by virtue of his role as Corey Cattle's counsel in reviewing and

approving contracts governed by Colorado law.  Docket No. 122 at 6.  Jon Corey is

correct that merely contracting with a Colorado resident is insufficient to confer specific

jurisdiction in this forum.  *See, e.g.*, *KEBD Enters., LLC v. Hider*, No. 08-cv-02665-REB-

---

*Stake Prod. Co. v. Talon Petroleum, C.A.*, 907 F.2d 1012, 1020 (10th Cir. 1990), the
Corey Defendants' activities are not unilateral, given the composition of "Corey
Defendants" to include Jon Corey and plaintiff has plausibly alleged Jon Corey's
connection to Corey Cattle.

CBS, 2009 WL 1504748, at *5 (D. Colo. May 26, 2009) (citing *SGI Air Holdings II, LLC v. Novartis Int'l*, 192 F. Supp. 2d 1195, 1202 (D. Colo. 2002)).  However, "[i]n a contract case, relevant factors for assessing minimum contacts include prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing."  *Benton v. Cameco Corp.*, 375 F.3d 1070, 1077 (10th Cir. 2004) (internal quotation and citation omitted).  Here, plaintiff alleges that Jon Corey was personally involved in the initial solicitations and communications through Notch Peak contract negotiations and those between Corey Cattle and plaintiff.  *See* Docket No. 55 at 4–5, ¶¶ 16, 18, 21.  The Contracts that plaintiff ultimately signed with Corey Cattle reflect that the parties agreed to litigate disputes in Colorado under Colorado law. Thus, since he negotiated the Contracts, Jon Corey likely contemplated that future litigation in Colorado was possible.  *See, e.g.*, *KEBD*, 2009 WL 1504748, at *5 ("The non-disclosure agreement [the defendant] executed specifically provides that it will be governed by Colorado law.  This factor, although not dispositive in itself, reaffirms [the defendant's] 'deliberate affiliation with [Colorado] and the reasonable foreseeability of possible litigation there.'" (quoting *Burger King Corp.*, 471 U.S. at 482)) (citing *Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1359 (10th Cir. 1990); *Plus Sys., Inc. v. New Eng. Network, Inc.*, 804 F. Supp. 111, 118 (D. Colo. 1992)).

With respect to plaintiff's tort claims, the test for minimum contacts is whether Jon Corey's actions "'were expressly aimed at' the forum jurisdiction and [whether] the forum jurisdiction was 'the focal point' of the tort and its harm."  *Far W. Capital, Inc. v. Towne*, 46 F.3d 1071, 1080 (10th Cir. 1995) (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)); *id.* at 1078 ("[W]hen a defendant intentionally takes some action with the

knowledge that the result will be harm to a specific victim in another state, the picture involves more than mere foreseeability or the likelihood that fortuitous and undirected conduct will have an effect in the state." (citation omitted)); *see also Newsome v. Gallacher*, 722 F.3d 1257, 1264–65 (10th Cir. 2013) (explaining that minimum contacts for tort claims requires "(a) an intentional action that was (b) expressly aimed at the forum state with (c) knowledge that the brunt of the injury would be felt in the forum state") (ellipses omitted); *TransFirst, LLC v. Brown*, 323 F.R.D. 641, 649 (D. Colo. 2018).

Plaintiff has alleged that Jon Corey and the other Corey Defendants continued to send feed bills to plaintiff in Colorado even though Corey Cattle had already sold plaintiff's cattle, *see* Docket No. 55 at 8, ¶ 29, that the Corey Defendants refused to pay plaintiff, a Colorado-based company, the proceeds of plaintiff's cattle that Corey Cattle sold, *id.* at 10, ¶ 43, and that Jon Corey siphoned the proceeds to Dantes, when they should have gone to plaintiff.  *Id.* at 9, ¶ 35.  Plaintiff has met its burden to allege a prima facie case that Jon Corey intentionally directed his actions at plaintiff in Colorado with knowledge that plaintiff's injury would be felt here.[9]

Contacts alone, however, are not sufficient because a plaintiff's claims must arise out of or relate to the defendant's contacts with the forum state, such that there is a connection between the plaintiff's lawsuit and the defendant's activities in the state.  The

---

[9] Although Jon Corey insists that any injury to plaintiff would be felt not in Colorado, but in Canada, where he says plaintiff's parent company runs its businesses, Docket No. 122 at 8 n.2, plaintiff states that it is a Colorado-based LLC and that "[a]ll losses caused by the Corey Defendants . . . were incurred by [plaintiff] in Colorado," which losses "impacted [plaintiff's] ability to fund overhead in Colorado, enter other transactions in Colorado, and derive revenue in Colorado."  Docket No. 55 at 9, ¶ 32. The Court decides factual disputes in plaintiff's favor.  *See Dudnikov*, 514 F.3d at 1070.

"arise out of" component generally is met when there is a causal relationship between the two.  A plaintiff can meet the "relate to" component by another kind of relationship, affiliation, or connection.  *Ford Motor Co.*, 141 S. Ct. at 1025–26.  Both "arise out of" and "relate to" are sufficient, as the "rule does not require 'proof of causation' between 'a plaintiff's suit and a defendant's activities.'"  *Ditter v. Subaru Corp.*, No. 20-cv-02908-PAB-MEH, 2022 WL 889102, at *2 (D. Colo. Mar. 25, 2022) (quoting *Ford Motor Co.*, 141 S. Ct. at 1026).  The plaintiff can meet this requirement by showing that the "defendant's forum-related activities were an 'event in the causal chain leading to plaintiff's injury,'" *Tomelleri v. MEDL Mobile, Inc.*, 657 F. App'x 793, 796 (10th Cir. 2016) (unpublished) (quoting *Dudnikov*, 514 F.3d at 1078), or by showing that "any of the defendant's contacts with the forum are relevant to the merits of plaintiff's claim."  *Id.*

Jon Corey argues that he had no contact with Colorado that "relates to this matter" because the dispute in this lawsuit relates to Corey Cattle's contractual relationship with plaintiff, and thus that plaintiff has not shown that its injuries arise out of Jon Corey's contact with Colorado.  Docket No. 122 at 8–9.  Plaintiff's allegations, however, state otherwise.  His contacts with plaintiff in Colorado through, for example, preparing solicitations to plaintiff and negotiating contracts with plaintiff, the Corey Defendants sending feed bills to plaintiff in Colorado, refusing to pay plaintiff for the proceeds of the Sold Cattle, and his personally siphoning those proceeds from plaintiff in Colorado to Dantes, *see* Docket No. 55 at 4, 8–10, ¶¶ 16–18, 29, 35, 43, were events in the causal chain leading to plaintiff's alleged injury and are the events that underlie the merits of plaintiff's claims.  *See Tomelleri*, 657 F. App'x at 796.  Plaintiff, therefore, has sufficiently alleged a prima facie case that its alleged injuries arise from Jon Corey's

contact with Colorado.[10]

Ordinarily, the Court would next consider whether its exercise of personal jurisdiction over Jon Corey would offend "traditional notions of fair play and substantial justice." *See Asahi*, 480 U.S. at 105.  Jon Corey, however, does not address this issue in his motion and has therefore waived it.  *See, e.g.*, *White v. Christian*, 474 F. Supp. 3d 1196, 1199 (D. Colo. 2020) (noting that personal jurisdiction can be waived).  Although Jon Corey mentions fair play and substantial justice in a single sentence of his reply, that is insufficient for two reasons.  First, a party may not raise an argument for the first time in a reply.  *See Gutierrez*, 841 F.3d at 902.  Second, a single-sentence mention of fair play and substantial justice is not sufficient to raise the argument.  *See United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) ("The court will not consider . . . issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation."); *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived.").

Even if plaintiff's arguments were insufficient to establish the Court's personal jurisdiction over Jon Corey because of his own contacts with Colorado, Corey Cattle's contacts can be imputed to Jon Corey because Colorado recognizes personal jurisdiction based on alter ego.  *See, e.g.*, *TransFirst*, 323 F.R.D. at 653 ("In Colorado, personal jurisdiction may be exercised on a theory of alter ego." (citing *Griffith v. SSC*

---

[10] Jon Corey claims that the alleged fraudulent transfer to Dantes was a legitimate rental payment from Corey Cattle pursuant to a written lease agreement. Docket No. 122 at 9–10.  Plaintiff, however, disputes this through deposition testimony and other evidence.  Docket No. 127 at 5–6.  Because the Court decides factual disputes in plaintiff's favor, *see Dudnikov*, 514 F.3d at 1070, the Court accepts plaintiff's allegations at this stage.

*Pueblo Belmont Operating Co. LLC*, 381 P.3d 308, 312 (Colo. 2016)).[11]  As the court in *TransFirst* noted, the Court must first determine whether it is appropriate to pierce the corporate veil so as to impute the LLC's contacts to its members.  *See id*.  "A court may pierce the corporate veil when '(1) the entity is merely the alter ego of the member, (2) the LLC form is used to perpetuate a wrong, and (3) disregarding the legal entity would achieve an equitable result.'"  *Id.* (quoting *Griffin*, 381 P.3d at 313).  To determine whether the corporation is merely the alter ego of the member, the Court considers whether the LLC (1) is operated as a distinct business entity, (2) maintains its funds separately, and (3) keeps adequate records.  *Id.* (citing *Stockdale v. Ellsworth*, 407 P.3d 571, 576–77 (Colo. 2017)).  The Court also considers whether (4) the nature and form of the LLC's ownership and control facilitate misuse by an insider, (5) the business is thinly capitalized, (6) the LLC is used as a mere shell, (7) LLC members disregard legal formalities, and (8) funds or assets are used for noncorporate purposes.  *Id.* (citing *Stockdale*, 407 P.3d at 576–77).

Although Corey Cattle may have conducted some legitimate business, that fact alone is not dispositive of the alter ego analysis.  Plaintiff alleges that Corey Cattle is Jon Corey's alter ego, and the Court finds the following allegations to be relevant.  When Mr. Skocdopole inquired of the proceeds from the Sold Cattle, Michael Corey responded that Jon Corey "took" the money.  Docket No. 55 at 13–14, ¶¶ 56, 59.  Jon

---

[11] Jon Corey claims that he is not aware of any Tenth Circuit case that has found personal jurisdiction on alter ego.  Docket No. 136 at 4.  Federal courts, including those within the Tenth Circuit, however, have "consistently acknowledged" the "alter ego theory of personal jurisdiction."  *See Warad W., LLC v. Sorin CRM USA Inc.*, 119 F. Supp. 3d 1294, 1298 (D. Colo. 2015) (citing *Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 653 (5th Cir. 2002), 4A Wright & Miller § 1069.4 n.12 (collecting cases)).  Moreover, the Court applies Colorado law, which permits courts to exercise personal jurisdiction based on alter ego.  *See Griffith*, 381 P.3d at 312.

Corey could access Corey Cattle's bank account and move money to himself and Dantes, even without Michael Corey's knowledge.  *Id.* at 14, ¶¶ 62, 63, 65.  Corey Cattle is not operated as a distinct corporate entity because it is used to further Michael and Jon Corey's personal interests, as they receive payments from Corey Cattle even though the company is not able to meet is financial obligations.  *Id.* at 17, ¶ 84.  Jon Corey comingles his assets with Corey Cattle's and Dantes's, and he has reported Corey Cattle assets as his own.  *Id.* at 17–18, ¶ 85.  Corey Cattle does not maintain adequate corporate records, was unable to provide proper head counts or feeding records, or even financial and accounting records on who bought the Sold Cattle and where the proceeds of the sale went.  *Id.* at 1819, ¶ 86.  Moreover, the nature of Corey Cattle's relationship with Jon Corey and Dantes facilitates misuse, as Jon Corey owns 80% of Corey Cattle and 100% of Dantes, and Dantes is Corey Cattle's landlord, which has enabled Jon Corey to pay Dantes with money that was owed to plaintiff for the sale of plaintiff's cattle.  *Id.* at 19–20, ¶ 87.  Jon Corey has unrestricted access to and control over Corey Cattle's finances, even though defendants assert that Jon Corey had minimal day-to-day involvement in the cattle operations.  *Id.*  Finally, Corey Cattle is thinly capitalized and lacks sufficient funds to meet its financial obligations, like its debt to plaintiff.  *Id.* at 20, ¶ 88.

These allegations, accepted as true, are sufficient for plaintiff to establish a prima facie case that Corey Cattle was Jon Corey's alter ego.  Jon Corey's arguments to the contrary are not convincing.  First, although Jon Corey does not dispute the Court's jurisdiction over Corey Cattle, *see* Docket No. 136 at 5, Jon Corey argues that plaintiff's alter ego allegations are conclusory.  *Id.*  He is mistaken.  Conclusory allegations are

those without factual support that simply recite elements of a cause of action or theory, *see, e.g.*, *Cory*, 583 F.3d at 1244 (discussing conclusory allegations in the Rule 12(b)(6) context), yet, as detailed previously, plaintiff provides factual support for its allegations that Corey Cattle does not maintain separate funds or keep adequate records, is structured to facilitate misuse by Jon Corey, who disregards legal formalities and uses corporate funds, which are thin, for noncorporate purposes.

Second, Jon Corey argues that Corey Cattle's "only contact with Colorado was the choice of law provision in the Contracts." Docket No. 136 at 5. That argument, however, ignores that Corey Cattle engaged in negotiations with a Colorado-based LLC, received cattle from a Colorado-based LLC, sent bills to a Colorado-based LLC, sold cattle without authorization that belonged to a Colorado-based LLC, and kept proceeds that belonged to a Colorado-based LLC. Contrary to Jon Corey's argument that the lawsuit did not arise out of these contacts, *see id.* at 7–8, these very issues form the basis of plaintiff's complaint.

Next, Jon Corey attempts to distinguish *TransFirst*, which plaintiff relies upon to support its argument that personal jurisdiction can be based on alter ego. *Id.* at 5–6. Jon Corey argues that, unlike that case, where the "plaintiff was actually operating in Colorado" and "the Court found that Colorado had an interest in the case and the plaintiff had an interest in receiving relief in its principal place of business," *id.* at 5 (quotation and emphasis omitted), "[n]o such interest exists here" because plaintiff "admittedly has no business in Colorado." *Id.* However, this assertion runs counter to plaintiff's allegations, which are that plaintiff operates its entire United States business out of Colorado and that it suffered the damages that are the subject of the complaint in

Colorado.

The Court further finds that plaintiff has adequately established that Corey Cattle was used to perpetuate a wrong, as Jon Corey allegedly moved assets that were owed to plaintiff out of Corey Cattle to Dantes and then to himself, and Corey Cattle submitted feed bills to plaintiff for cattle that it had already sold. *See TransFirst*, 323 F.R.D. at 654. Finally, piercing the veil regarding Corey Cattle would produce an equitable result because plaintiff may not be able to recover against Jon Corey personally, as Michael Corey has already declared bankruptcy and the Coreys' assets are unknown. Accordingly, the Court finds that it has personal jurisdiction over Jon Corey, and the Court will deny that portion of the motion.

### 2. Claims Against Jon Corey

Jon Corey argues that, if the Court finds that it has personal jurisdiction over him, it should still dismiss plaintiff's fraud, breach-of-contract, and fraudulent transfer claims against him. Docket No. 122 at 11–13.

### a. Fraud Claim

Plaintiff's third claim is for fraud against the Corey Defendants. Docket No. 55 at 24–26, ¶¶ 116–32. "A plaintiff seeking to prevail on a claim of '[f]raud' must establish that: (1) the defendant made a false representation of material fact; (2) the one making the representation knew that it was false; (3) the person to whom the representation was made was ignorant of the falsity; (4) the representation was made with the intention that it be acted upon; and (5) the reliance resulted in damage to the plaintiff." *Ibrahim v. Deutsche Lufthansa Aktiengesellschaft*, No. 15-cv-02358-MEH, 2016 WL 1274600, at *8 (D. Colo. Apr. 1, 2016) (citing *Vinton v. Virzi*, 269 P.3d 1242, 1247 (Colo. 2012)).

For claims sounding in fraud, a plaintiff must meet the heightened pleading requirements under Federal Rule of Civil Procedure 9(b).  *See Airquip, Inc. v. HomeAdvisor, Inc.*, No. 16-cv-01849-PAB-KLM, 2017 WL 4222618, at *7 (D. Colo. Sept. 21, 2017) (citing *Baker v. Wood, Ris & Hames, Prof'l Corp.*, 364 P.3d 872, 883 (Colo. 2016) ("Colorado courts have consistently required all claims sounding in fraud to be pleaded with particularity.")).  This means that a plaintiff must, at the minimum, "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof."  *Id.* at 8 (quoting *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 727 (10th Cir. 2006)).  "Although a plaintiff may generally plead '[m]alice, intent, knowledge, and other conditions of a person's mind,' Rule 9(b) 'merely excuses a party from pleading discriminatory intent under an elevated pleading standard.  It does not give him license to evade the less rigid – though still operative – strictures of Rule 8.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 686–87).  "[W]here fraud is alleged against multiple defendants, blanket allegations of fraud couched in language such as 'by the defendants' are insufficient.  Instead, the specifics of the alleged fraudulent activity of each defendant must be set forth."  *Id.* (quoting *Lillard v. Stockton*, 267 F. Supp. 2d 1081, 1094 (N.D. Okla. 2003)).

Jon Corey argues that plaintiff has not met the heightened pleading standard for its fraud claim against him because plaintiff does not identify a misrepresentation that Jon Corey allegedly made to one of plaintiff's representatives or a false representation that plaintiff relied upon, or that Jon Corey knew that a representation was false or that plaintiff would rely upon it.  Docket No. 122 at 11–12.  Plaintiff responds that the same

veil piercing that permits the Court to exercise personal jurisdiction over Jon Corey

through his use of Corey Cattle as an alter ego also permits the Court to hold him liable

for Corey Cattle's misrepresentations.  Docket No. 127 at 12–13.

Although the complaint does not allege that Jon Corey made false

representations of material fact that plaintiff relied upon,[12] the Court notes the "weight of

authority that, when fraudulent statements are attributed to an alter ego of the individual

alleged to have made the misrepresentation, the strictures of Rule 9(b) don't apply to

the allegations against alter ego."  *See Athena Botanicals, LLC v. Green Earth Techs.,*

*LLC*, No. 19-cv-03275-DDD-GPG, 2020 WL 10320951, at *4 (D. Colo. July 9, 2020)

(citing *Wichita Destination Developers, Inc. v. Focus Hosp. Servs., LLC*, 365 F. Supp.

3d 1172, 1180–81 (D. Kan. 2019) ("As a general rule, allegations of alter ego liability,

even when premised on claims of potentially fraudulent conduct, are governed by the

liberal notice standard of Rule 8(a) rather than the particularity standard contained in

Rule 9(b)." (quoting *Wiebe v. Benefits Mgmt. Corp.*, 1993 WL 246096 (D. Kan. June 17,

1993)); *United States ex rel. Wilkins v. North Am. Constr. Corp.*, 173 F. Supp. 2d 601,

643 n.34 (S.D. Tex. 2001) ("Rule 9(b) is not applicable to the alter ego when fraud has

properly been alleged against the principal."); *see also Network Enterprises, Inc. v.*

*APBA Offshore Prods., Inc.*, 2002 WL 31050846, at *5 (S.D.N.Y. Sept. 12, 2002) (Rule

---

[12] Plaintiff alleges that the Corey Defendants – and, in particular, Jon Corey – drafted solicitations and communications to plaintiff through Notch Peak, *see, e.g.*, Docket No. 55 at 4–5, ¶¶ 16, 18, 20–21, yet there are no allegations that any of these initial communications were fraudulent, and plaintiff does not specify the "time, place and contents" of them.  *See Airquip*, 2017 WL 4222618, at *8.  Plaintiff's allegations that Jon Corey was directly involved in Corey Cattle's alleged theft from plaintiff because he received and authored communications concerning the relationship, oversaw financial and legal matters concerning the relationship, and ultimately pocketed money" that was owed to plaintiff for the sale of the Sold Cattle, Docket No. 55 at 13, ¶ 55, similarly lack the specificity that Rule 9 requires.

9(b) doesn't apply to alter egos when alter-ego theory isn't premised on fraudulent conduct); *Rolls-Royce Motor Cars, Inc. v. Schudroff*, 929 F. Supp. 117, 122 (S.D.N.Y. 1996) (same)).

Plaintiff has alleged that the Corey Defendants falsely stated that they had fed the Sold Cattle $112,545.12 in feed during April 2019, after Corey Cattle had already sold those cattle.  *See* Docket No. 55 at 12, ¶ 53.  Plaintiff then alleges that the Corey Defendants collected money from plaintiff for feed and care for cattle that had already been sold.  *Id.* at 13, ¶ 54.  Although generally "allegations of fraud couched in language such as 'by the defendants' are insufficient," *see Airquip*, 2017 WL 4222618, at *8, plaintiff attaches the actual allegedly fraudulent invoice to the complaint, which was sent by Corey Cattle.[13]  *See* Docket No. 55-5.  The Court imputes the actions of Corey Cattle to Jon Corey for the reasons noted previously.  Plaintiff further alleges that the Corey Defendants knew that the invoice was false when they sent it because they "falsified" invoices to "conceal their theft."  Docket No. 55 at 12, ¶ 52.  Plaintiff was ignorant of the falsity, as it did not discover the missing cattle until June 2019.  *Id.* at 16, ¶ 80.  The allegedly falsified invoice was made with the intent that it be relied upon to conceal the sale of the cattle, and, although there is no allegation that plaintiff paid this particular bill, plaintiff alleges that it could not recover the cattle that had not been sold until June 2019 and had to move those cattle "mid feeding cycle," which resulted in a loss of value and performance of those cattle.  *Id.*, ¶ 81.  Plaintiff therefore has plausibly alleged fraud

---

[13] The Court may consider the invoice because it is referenced in the complaint and attached to it, and defendants do not dispute the invoice's authenticity.  *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) ("[T]he district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.")

against Jon Corey, and that claim survives plaintiff's motion to dismiss.

### b. Breach-of-Contract Claims

Plaintiff's fourth, fifth, sixth, and seventh claims are brought against the Corey Defendants for breach of the Contracts.  Docket No. 55 at 26–29, ¶¶ 133–64.  The elements of a breach of contract are (1) the existence of a binding agreement; (2) plaintiff's performance of its obligations or some justification for its non-performance; (3) defendant's failure to perform its obligations; and (4) damages resulting therefrom.  *W. Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).  Jon Corey does not dispute any of these elements on the merits, but rather argues that the Court should dismiss these claims because he did not sign the Contracts and was not a party to them.  Docket No. 122 at 11 ("It is hornbook law that a contract can be enforced only against a party to a contract."  (quoting *Frontier Airlines, Inc. v. United Air Lines, Inc.*, 758 F. Supp. 1399, 1406 (D. Colo. 1989)).  However, this argument ignores that, as this Court has noted, state and federal courts have recognized veil-piercing/alter ego as a way to bind a non-signatory to a contract.  *See Woodward, Inc. v. ZHRO Sols., LLC*, No. 18-cv-01468-PAB-STV, 2019 WL 1438076, at *5 (D. Colo. Mar. 31, 2019) (citing cases).  For instance, in *Boxer F2, L.P. v. Flamingo W., Ltd.*, No. 14-cv-00317-PAB-MJW, 2016 WL 3355566, at *15 (D. Colo. June 17, 2016), *aff'd sub nom. Boxer F2, L.P. v. Bronchick*, 722 F. App'x 791 (10th Cir. 2018) (unpublished), the Court pierced the corporate veil and held a non-signatory to a contract liable for breach.  Because Jon Corey has provided no other basis for the Court to dismiss this claim, and the Court has already pierced the corporate veil between Corey Cattle and Jon Corey, the Court will deny Jon Corey's motion to dismiss this claim.

27

### c. Fraudulent Transfer Claim

Plaintiff's eighth claim is that the Corey Defendants' transfer of $478,979.21 of the proceeds from the Sold Cattle, which should have gone to pay plaintiff, was a fraudulent transfer in violation of CUFTA.  Docket No. 55 at 29–31, ¶¶ 165–76.  CUFTA "provides in summary that a debtor's transfer of assets is fraudulent if it was made [1] with the intent to hinder, delay or defraud a creditor or [2] [(a)] without receiving equivalent value in return" and (b) under circumstances in which it was reasonably unlikely that the debtor's remaining assets would be sufficient to satisfy the debtor's outstanding debts.  *See Kirzhner v. Silverstein*, 870 F. Supp. 2d 1145, 1161 (D. Colo. 2012); *CB Richard Ellis, Inc v. CLGP, LLC*, 251 P.3d 523, 529-30 (Colo. App. 2010) (discussing CUFTA's "constructive fraud" provision provided in Colo. Rev. Stat. §§ 38-8-105(1)(b)(I) and (II)); *see also In re Grandote Country Club Company, Ltd.*, 252 F.3d 1146, 1151 (10th Cir. 2001) ("To run afoul of CUFTA, a transfer must involve 'actual intent to hinder, delay, or defraud any creditor' or must have been made for less than 'reasonably equivalent value.'"); *Boxer F2*, 2016 WL 3355566, at *16.

Jon Corey argues for dismissal of this claim on two grounds.  First, he argues that that plaintiff has failed to plead with particularity when the transfer allegedly took place and how the funds flowed from Corey Cattle.  Docket No. 122 at 12.[14]  Jon Corey is mistaken, as plaintiff alleges that, on April 2, 2019, Jon Corey  "accessed the bank account in which Corey Cattle deposited cattle proceeds stolen from [plaintiff]," which he then "transferred not less than $478,979.21 of [plaintiff's] cattle

---

[14] Plaintiff does not dispute that fraudulent transfer claims must be pled with particularity under Rule 9(b), and Jon Corey is correct that they must be.  *See, e.g.*, *Pernick v. Computershare Tr. Co., Inc.*, 136 F. Supp. 3d 1247, 1272 n.24 (D. Colo. 2015).

proceeds to Dantes."  Docket No. 55 at 14, ¶ 62.  This allegation shows precisely when and how the allegedly fraudulent transfer took place and how the funds flowed from Corey Cattle to Dantes.

Second, Jon Corey argues that plaintiff's allegations of Jon Corey's intent are conclusory because plaintiff "parrots the language from [CUFTA] without more."  Docket No. 122 at 13.  Although some of plaintiff's allegations are cursory, *see* Docket No. 55 at 29–30, ¶¶ 166–75 (alleging that Dantes was an insider of Corey Cattle, that Corey Cattle retained in possession of the funds, that the Corey Defendants misrepresented the transfer to plaintiff, that Corey Cattle removed and concealed assets, that Corey Cattle was or became insolvent shortly thereafter, that the transfer occurred around the time of a substantial debt, that the transfer was made to an insider, and that at the time of the transfer Dantes had no reason to think that Corey Cattle was insolvent), plaintiff provides factual support for these allegations elsewhere in its complaint.  For instance, plaintiff alleges, among other things, that Dantes was an insider of Corey Cattle because Jon Corey owned 100% of Dantes and 80% of Corey Cattle and transferred assets freely between the companies, that Corey Cattle remained in possession of the proceeds of the sale of plaintiff's cattle, which the Corey Defendants owed to plaintiff, until Jon Corey transferred those funds to Dantes, that the Corey Defendants allegedly misrepresented the transfer as a rent payment to Dantes, and that Corey Cattle is now insolvent.  The Court finds that, based on these allegations, which the Court assumes to be true, plaintiff has plausibly alleged a fraudulent transfer claim against Jon Corey.  Accordingly, this claim survives Jon Corey's motion to dismiss.

### B.  Dantes's Motion to Dismiss

Like Jon Corey did, Dantes argues that the Court lacks personal jurisdiction over it or, if the Court finds that it has personal jurisdiction, the Court should dismiss plaintiff's claims against Dantes under Rule 12(b)(6).  *See generally* Docket No. 121.

Dantes's personal jurisdiction arguments are two-fold.  First, Dantes argues that Tenth Circuit precedent precludes personal jurisdiction on a reverse veil-piercing theory.  *Id.* at 5–6.  Second, Dantes argues that it did not purposefully avail itself of Colorado and that plaintiff failed to allege any conduct by Dantes directed at Colorado.  *Id.* at 7–8.  The Court considers Dantes's purposeful availment arguments first because, if the Court finds that Dantes purposefully availed itself of Colorado and had sufficient minimum contacts here, the Court need not consider the reverse veil-piercing issue.

Plaintiff alleges that Dantes directed its conduct at plaintiff in Colorado by allegedly "taking money from a Colorado resident knowing that" plaintiff would suffer damages in Colorado.  Docket No. 55 at 9, ¶ 35.  By doing so, plaintiff alleges, Dantes participated in a conspiracy to enter Colorado and defraud and steal from plaintiff, a Colorado resident.  *Id.*  Dantes allegedly did this because, "[w]hile the Corey Defendants held custody of [plaintiff's] cattle the Corey Defendants and Dantes stole the cattle, sold the cattle, and pocketed the money," *id.* at 10, ¶ 42, which Dantes has retained.  *Id.* at 14, 16, ¶¶ 62–64, 79.  Although the Court generally assumes plaintiff's allegations are true, *see Dudnikov*, 514 F.3d at 1070, plaintiff's allegations about the alleged scheme are inconsistent.  Elsewhere in the complaint, plaintiff makes clear that Dantes did not actually take the proceeds itself.  Rather, according to the complaint, the money went to Corey Cattle, and Jon Corey then transferred it to Dantes, possibly as a

rent payment.  That is also how plaintiff frames the events in its response.  *See, e.g.*,

Docket No. 124 at 2–5, 11 ("Dantes acted through the only person it could act: Jon.").

As a whole, the Court does not find that Dantes itself – rather than Jon Corey personally

or Corey Cattle – purposefully directed any activities at plaintiff in Colorado.  The Court

therefore must consider whether and to what extent plaintiff may establish the Court's

personal jurisdiction over Dantes through alter ego or veil piercing.

Assuming that Dantes is an alter ego of Jon Corey, which Dantes does not

meaningfully dispute, Dantes argues that Tenth Circuit precedent, specifically *Home-*

*Stake*, precludes jurisdiction over Dantes.  Docket No. 121 at 5–6.  The Tenth Circuit

held in *Home-Stake* that a parent's contacts with the forum state could not be imputed

to its subsidiaries based solely on alter ego.  907 F.2d at 1020–21.  The court

explained,

> When one defendant completely controls another, the latter's contacts
> with the forum may fairly be imputed or attributed to the former. . . .  In
> such situations, attribution of contacts to the [controlling] individual
> defendant merely reflects the reality that, although the contacts were
> ostensibly those of the corporation, the true actor was the individual.  The
> same situation obtains in those cases holding a corporate parent to
> answer for conduct within the forum carried out by an alter ego subsidiary.
>
> But the rationale of these cases does not support the proposition that,
> because the court has jurisdiction over a parent corporation or dominating
> individual, without more, it has jurisdiction over the alter ego corporation.
> The dominated corporation does not direct and control its dominating
> corporate or individual alter ego.  Accordingly, it is unfair to impute to the
> dominated corporation the forum contacts of its alter ego. . . .  [The alter
> ego defendants] have, as much as any other defendant, a constitutionally
> protected liberty interest in not being subject to the binding judgments of a
> forum with which [they have] established no meaningful contacts, ties, or
> relations.

*Id.* (internal quotations omitted).  In other words, "[w]hile under some circumstances a

subsidiary corporation's contacts may be imputed to a parent for the purposes of

jurisdiction, the reverse is not true." *Vacation Travel Int'l, Inc. v. Sunchase Beachfront Condo. Owners Ass'n*, No. 06-cv-02195-LTB-CBS, 2007 WL 757580, *5 (D. Colo. Mar. 8, 2007) (citing *Home-Stake*, 907 F.2d at 1021). Other courts have reached similar conclusions. For instance, in *Horizon/CMS Healthcare Corp. v. Ortenzio*, 1998 WL 36030649, at *4 (D.N.M. July 22, 1998), the court found that, even if the individual defendant were the alter ego of the corporate defendant, the court would not have personal jurisdiction over the corporate defendants solely based on alter ego because, "while sometimes a court may fairly impute to an alter ego the contacts of the corporation he dominates, the reverse is not possible." *Id.*; *see also Kim v. Czerny*, 2017 WL 3084466, at *8 (D.N.M. July 17, 2017) ("This general rule [that the court can disregard the corporate form and impute jurisdiction to a parent base upon its subsidiary's contacts] applies only to impute the subsidiary's contacts to the parent, not the other direction."); *Gas Sensing Tech. Corp. v. Ashton*, 2017 WL 2955353, at *6 (D. Wyo. June 12, 2017) (noting that the court could exercise personal jurisdiction over a parent based on a subsidiary's contacts, but that the Tenth Circuit has rejected the opposite situation); *Purple Onion Foods, Inc. v. Blue Moose of Boulder, Inc.*, 45 F. Supp. 2d 1255, 1259 (D.N.M. 1999) ("[T]he Tenth Circuit held that the alter-ego theory cannot be applied where the contacts of the dominating individual or corporation (in this case, Tellam) are sought to be attributed to the dominated corporation (in this case, Blue Moose). . . . [W]ere the situation reversed, attribution might be appropriate . . . [h]owever, where a corporation is an instrumentality of an individual, and it is the individual who has contacts with the forum state, the corporation is entitled to defend its status as a real legal entity, separate from the dominating individual, in a forum with

which the corporation itself has sufficient minimum contacts.").  The reasoning of *Home-Stake* and the cases applying it is persuasive.  As discussed previously, plaintiff has shown that the Court has personal jurisdiction over Jon Corey, who owns and controls Dantes, but that is not enough for the Court to exercise personal jurisdiction over Dantes, even assuming that Dantes is a mere instrumentality of Jon Corey.

Plaintiff attempts to distinguish *Home-Stake* on two grounds.  Docket No. 124 at 10.  First, plaintiff argues that *Home-Stake* applied Oklahoma law, not Colorado law.  *Id.* Although plaintiff is correct, Oklahoma's and Colorado's long-arm statues have both been construed to extend jurisdiction to the United States Constitution's due process limits.  Because the minimum contacts inquiry under both states' law tracks the Constitution's due process inquiry, the analysis under both states' law is the same. Moreover, numerous courts in this District and elsewhere have followed *Home-Stake* without applying Oklahoma law.  Second, plaintiff argues that *Home-Stake* was decided well before the Colorado Supreme Court recognized reverse veil piercing in *In re Phillips*, 139 P.3d 639, 645 (Colo. 2006).  Docket No. 121 at 10.  Plaintiff is correct that *Home-Stake* pre-dated *Phillips*, but plaintiff's reliance on *Phillips* is misplaced.  There is no question that reverse veil-piercing exists in Colorado law,[15] but *Phillips* did not discuss personal jurisdiction at all.  That case instead concerned liability.  *Phillips*, 139 P.3d at 646 ("A court may reverse pierce the corporate veil and obtain the assets of a

---

[15] Traditional veil piercing permits creditors or other plaintiffs recover the personal assets of an alter ego shareholder or member of a corporation or company in order to satisfy a judgment or debt.  "Reverse piercing occurs when a claimant seeks to disregard the separate existence of a corporation and obtain the assets of the entity due to the actions of a dominant shareholder or other corporate insider."  *Phillips*, 139 P.3d at 641.

corporation for the obligations of a controlling shareholder or other corporate insider only upon a clear showing that (1) the controlling insider and the corporation are alter egos of each other, . . . (2) justice requires recognizing the substance of the relationship over the form because the corporate fiction is utilized to perpetuate a fraud or defeat a rightful claim, . . . and (3) an equitable result is achieved by piercing."). Unlike in *Phillips*, the issue here is whether plaintiff can rely solely on reverse veil piercing for the Court's personal jurisdiction over Dantes. Because plaintiff cannot, the Court will grant Dantes's motion and will dismiss all of plaintiff's claims against it. [16]

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Jon Corey's Motion to Dismiss Amended Complaint [Docket No. 122] is **DENIED**. It is further

**ORDERED** that Dantes Holdings, LLC's Motion to Dismiss Amended Complaint [Docket No. 121] is **GRANTED**. It is further

**ORDERED** that all of plaintiff's claims against defendant Dantes Holdings, LLC are **DISMISSED without prejudice**.[17]

DATED September 13, 2022.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge

---

[16] Plaintiff asks the Court to follow *Patin*, 294 F.3d at 653, instead of *Home-Stake*, but plaintiff provides no reason for the Court to ignore clear Tenth Circuit authority, which the Court must follow, in favor of authority from another circuit.

[17] Dismissal for lack of personal jurisdiction is without prejudice. *See Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1216 (10th Cir. 2002).